[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings CT Page 2088
More than a year after their placement in foster care on August 29, 1990, Rita and Rosa E. and their brother, Emanuel G., became the subjects of petitions by which the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Rosa G. and Manuel E., their mother and putative father, alleging as to both all four of the nonconsensual grounds set forth in 17a-112 (b) of the Conn. Gen. Statutes (Rev. 1991) applicable to children, such as these, previously committed to the petitioner as neglected or uncared-for pursuant to 46b-129 (d).
At the initial hearing on October 9, 1991, service by publication on both parents was confirmed, their whereabouts being unknown on the date these petitions were signed by the Commissioner of DCYS on September 11, 1991. Between that date and the initial hearing, however, DCYS learned that the mother was incarcerated at Niantic, and she appeared with counsel at that hearing to contest the allegations of all three petitions. On motion of the petitioner, psychological evaluations of mother and children were ordered, the last such study having been made a year earlier. At the next hearing, on November 6, 1991, the petitioner's motion to amend the pleadings was granted to expand and update the facts underlying the statutory grounds pleaded for the relief sought. The adjudicatory date for determining grounds for termination is thus November 6, 1991 and not September 21, 1991 when the petitions were initially filed.
Trial was conducted on January 22, 1991 and January 29, 1992 when all parties rested and were given until February 13, 1992 for the submission of trial memoranda. That date was later extended at the request of respondant mother to February 20, 1992. The period of reserved decision is thus deemed to commence on the latter date.
At no time did the father appear or make his whereabouts or position known to the court or to any of the participants in this proceeding. CT Page 2089
Facts
Evidence offered in two trial days, interpreted in the light of the prior court record concerning these children and their mother, of which judicial notice is taken, supports the following findings of fact.
1. Prior to Commitment: Rosa G., abandoned by her parents and raised by an aunt, gave birth to her first child (not included in the instant proceedings) in Puerto Rico when she was 12 years old.
That child, now 13, has been placed in the guardianship of an unrelated man, with Rosa's consent, through the probate court.
Rosa came to the United States when that child was two years old and Rosa 14. The following year, at 15, she met Manuel E. who introduced her to drugs and with whom, despite chronic domestic violence and homelessness, she had three children: Rita, born August 8, 1984; Rosa, born August 12, 1986 and Emanuel, born October 2, 1988. The parents separated permanently in the summer before Emanuel was born, and the putative father — who apparently never acknowledged paternity, never was adjudicated to be the father, and never supported any of these children — has never seen the youngest and has not had any contact with the two girls since they were four and two years old respectively.
No referrals were received by DCYS on these children prior to the birth of Emanuel when it was reported that both mother and newborn tested positive for cocaine and heroin. Two months later a second referral was received concerning Rosa's non compliance with the baby's medical appointments, deemed essential for a high risk child whose mother had used drugs during the later stages of pregnancy, had eschewed prenatal care during the pregnancy and who tested positive for hepatitis as well as drug use at the time of birth. No legal action was then taken since Rosa appeared to have support from family members — an Emily N. who, it later developed, was in fact not related by blood to either parent — and secured the necessary medical attention for her son.
Even when, on April 24, 1991, a police officer, acting on an anonymous report, found all three children alone in an apartment that lacked electricity, gas and bathroom facilities and was strewn with drug paraphenalia and garbage, DCYS did not intervene because the mother represented that they would all be living with the "aunt", Eileen N. During their stay with Eileen, the children were well cared for by Eileen, with Rosa G. only visiting sporadically. In late July, 1990, however, CT Page 2090 Rosa took the children out of Eileen's care to live with her and her latest boyfriend, Angel M., at the latter's home. DCYS at that point lost track of these children until the following month when, on August 28, 1990, Rosa was arrested for possession of drug paraphenalia, driving without a license and failure to appear. Appearing to be under the influence of drugs at the time, Rosa refused to give DCYS permission to place her three children necessitating the securing of a 96-hour administrative "hold" pursuant to "17a-101(e). DCYS then filed neglect petitions and secured orders of temporary custody from this court pursuant to 46b-129 (b) to permit continued placement in foster care at the expiration of the 96 hours. Action on the neglect petitions was deferred until after a psychological evaluation by Dr. Ralph Welsh could be conducted in November of 1990. Rita G. incarcerated from the time of her arrest in August, was still in Niantic when the evaluation was conducted.
The psychologist recommended that the children not be returned to her, following her release from prison, ". . . until the patient has an appropriate place to live and can prove she is no longer using substances." (State's Exhibit K, p. 5.)
On December 20, 1991 Rosa G., represented by counsel, admitted to the allegation that her children were uncared-for, in the sense of being homeless within the definition in46b-120. No findings were made on the allegations of neglect. Rosa also agreed that her children should be committed to DCYS for an initial period of 18 months, pursuant to subsection (d) of 46b-129, and the court, by agreement of all parties, waived the requirement that she wait for six months following commitment before being able to initiate a petition to revoke this commitment. (Subsection (g), 46b-129.)
2. Subsequent to Commitment: Rosa G. was released from prison in late January of 1991, and promptly scheduled a visit with her children for January 31, 1991. The children, then living in two different foster homes, were picked up and brought to the DCYS office, but their mother failed to appear. She came to the office the following week, however, and executed a service agreement (State's Exhibit D) in which she undertook to enter a 28-day in-patient drug program at CASA, obtain adequate housing, visit with her children bi-weekly at the DCYS office, and call the DCYS social worker weekly. The mother also agreed to remain drug and alcohol free, and she and the social worker were to review the situation after two months on May 7, 1991 "to see if reunification is a possibility". Id., p. 2.) On the date this agreement was signed (February 27, 1991), a visit was arranged for the following week, which took place. CT Page 2091
In a review in court on March 12, 1991 attended by the mother, it was reported that she was visiting consistently and participating in Project Fire, a drug day treatment program. Two and one-half months later, however, on May 30, 1991 the situation had changed: In another judicial review, DCYS reported that Rosa had not requested a visit for six weeks and had been reported to have tested positive for cocaine. At the time of her last visit, April 19, 1991, the DCYS social worker had transported Rosa to the Meriden-Wallingford Hospital for an inpatient detox program. DCYS learned later that she had not entered the program, however, since she was pregnant at the time. Nor did she enter it after the pregnancy had been terminated. In the month following this review, Rosa renewed contact with DCYS, asked for a job reference (June 26, 1991) and signed a new service agreement on July 2, 1991 (State's Exhibit F.) in which she agreed to continue attending the AIC drug program, remain substance free, and start visiting biweekly as soon as AIC could verify that she was drug free. She was warned that upon her continued failure, DCYS would file for termination of her parental rights. That was the last that the social worker or her probation officer saw her until these petitions were initially prepared. At the time of filing, her whereabouts in Niantic were disclosed to DCYS by her parole officer.
Soon after their placement in foster care, the two girls began displaying sleeping and eating disorders, were fearful of the dark, and started to act out sexually while Emanuel, who was only ten months old when placed in foster care, adjusted well. As they settled into the foster home, the girls reported having been left alone in their apartment, witnessing physical fights between their mother and a variety of men, being hungry, seeing their mother and her male friends injecting drugs. They further began reporting having been sexually abused by various men — naming their father, "Angel", and others — and witnessing their mother in sexual activity with a number of different men. (State's Exhibit C. pp. 10-13.) Following these disclosures, the girls' sexual acting out accelerated, leading the foster mother to request Rita's removal. Rita was placed in mid-May, 1991, with a foster mother who was a friend of Rosa's — the mother of Eileen N. After a month, however, she was again removed, following an unauthorized visit by Rosa G. in which Rita had been told that her mother had stopped using drugs, had an apartment and only DCYS prevented her return to her mother's care. None of this was true, however, and the child's resulting distress dictated her removal to a temporary foster home and thereafter, on August 27, 1991, she and her sister were both placed in the foster home where their little brother had lived since November of 1990. CT Page 2092
When Rosa G. was told in March of 1991 of her daughter's disclosures of sexual activities while living with her, she expressed only disbelief notwithstanding verification of these stories by Dr. Horowitz, a clinical psychologist who had been asked to evaluate both girls following their revelations. (States Exhibit A and B).
Although not disclosed to DCYS at the time, Rosa G. after giving a "dirty urine", had entered and completed a thirty-day detox program, arranged by her parole officer, at Danbury Hospital, ending on June 19, 1991. From there she had been referred to CASA for an inpatient program but instead chose an outpatient program, which she discontinued soon after intake. Referred then to the AIC program, which was also acceptable to her parole officer, she participated only briefly. After July 2, 1991, she stopped visiting the children, engaged in no drug treatment and remained whereabouts unknown to her parole officer, as well as to DCYS until she was again arrested and incarcerated in September. Requests for prison visits in Niantic were deferred until advice could be secured from Dr. Welsh, the psychologist who had seen the family in November of 1990 and again in October of 1991, when he found it ". . . highly doubtful Ms. G. will ever be able to provide these children any kind of stability in their life." In a letter to the social worker dated November 7, 1991 (State's Exhibit M) he stated:
 . . . it is my clinical opinion that further visitations regarding Rosa G. and her children are likely to be extremely stressful for all parties involved, and probably unwarranted since Ms. G. does not appear to be an individual who is likely to get her life together in the near future. If there was any indication that Ms. G. was either on the verge of turning herself around or had an appropriate support system, other than her street friends, who could assist her in doing so, I might reconsider. At this point in time the situation looks bleak for her ultimate rehabilitation.
On the strength of this recommendation, no visits to Niantic were permitted pending resolution of the instant petitions.
Rosa G. was transferred from Niantic to a 30-day "lock-in" substance abuse program which she completed on January 10, 1992. Five days later she was arrested for larceny and re-incarcerated under a high bond. (Testimony of parole officer DeFeo, January 22, 1992.) As of the final trial date she remained incarcerated. CT Page 2093
Adjudication — As of date Petition last amended (November 6, 1991)
1) Acts of parental omission or commission. The petitioner has pleaded all four nonconsensual grounds for terminating the rights of parents of children committed to DCYS set forth in17a-112. Respondant mother argues that one of these must be dismissed as to both parents for failure of the petitioner to offer proof that any of these children, since their placement in the custody of DCYS fourteen months before the adjudicatory date, have been ". . . denied, by reason of an act or acts of parental commission or omission, the care guidance or control necessary for . . . [their] physical, educational, moral or emotional well-being." The petitioner is not, however, confined to such acts occurring subsequent to their placement in the care of DCYS. If knowledge of parental acts which occurred prior to placement is gained only after placement, it may be pleaded as grounds for termination of parental rights. That is the case here: From the safety of foster care, the girls began gradually to reveal the circumstances of their lives before placement which Dr. Horowitz, seeing them three months after placement, characterized as emotional neglect. He confirmed the veracity of their revelations of sexual abuse while living with their mother. The fact that the children, with their mother's agreement, were found to be uncared-for because she could not provide them with a home in September of 1990 because of her incarceration does not preclude DCYS from now alleging facts supporting a finding of abuse which came to light subsequent to commitment. The confirmed revelations of sexual abuse at the hands of their mother's boyfriends (specifically "Angel"), as well as being witnesses to their mother's sexual activity with a variety of men, constitutes a denial of proper care sufficient to terminate parental rights, even though it occurred prior to the state's assumption of the custody of these girls. As to Rita and Rosa, therefore, there is clear and convincing proof that while living with their mother they were denied the care, guidance and control necessary for their moral and emotional well-being. While these circumstances occurred while the children were in their mother's care, their acknowledged father, in the absence of any custody order precluding his discharging joint responsibility for their care, must be held equally accountable. The state has, therefore, provided clear and convincing proof of this ground to terminate the rights of both parents of Rita and Rosa.
(2) Failure to Rehabilitate
Respondant mother argues that there is nothing in CT Page 2094 the record to support a waiver of the 12 month requirement for grounds to have existed before termination can be ordered under under 17a-112. She is incorrect, however, that the adjudicatory date is September 12, 1991 and thus requires a waiver of more than three months: The adjudicatory date is November 6, 1991, the date of the latest amendment, requiring a waiver of only six weeks. Considering that on November 6, 1991 Rosa G. was incarcerated with no announced date of release, as well as the ages of these children and the circumstances under which they had lived for at least five months before DCYS finally took action and removed them, a waiver of this brief period is clearly "necessary to promote the best interest of the child[ren]". (Subsection (c) of17a-112.) It is also arguable that efforts by DCYS to rehabilitate the mother should be considered not from the date of commitment — which may be continued for any number of reasons unrelated to parental efforts to improve caretaking capacities — but from the date those efforts to rehabilitate had commenced. In this case, all three children were found alone in their apartment on April 23, 1990. DCYS could have intervened then and removed the children, but chose not to do so.
Instead, efforts were made to ensure that the mother would be living in a protected environment with her purported relative, Eileen N., and referrals were made for Rosa G. to obtain the drug treatment she then acknowledged she needed. The actual period that DCYS worked with Rosa G. to improve her ability to care for these children began in April of 1990, not in December of 1990 when the children happened to be committed. At the very least, such period should be deemed to commence at the moment DCYS assumed custody (August 30, 1990) rather than the commitment date four months later.
The ultimate test of this ground for termination of parental rights is not whether a parent, from time to time during a child's commitment, has made some efforts to rehabilitate. As her probation officer testified, Rosa G., when not abusing drugs, is a cooperative, competent person who would be capable of discharging ordinary responsibilities. But on the adjudicatory date of November 6, 1991 Rosa G. was in exactly the same position that she was on the date her children were initially removed (August 30, 1990) and the subsequent date when they were committed upon her admission that she could not then provide them with a home because of incarceration. In the interim she made sporadic but unsustained efforts to seek drug treatment, all of which were aborted notwithstanding that such treatment was a condition of her parole which left her at liberty to maintain contact with her children. In the CT Page 2095 immediate period after her release from prison in January of 1991 she cooperated with her parole officer and with DCYS. The many service agreements attest to the plan, at the time, to reunite the children with their mother if she could sustain sobriety, maintain visitation, and secure an adequate place for them to live. Four months later, however, she was again using drugs, and after a month-long detox hospital stay, disappeared from the view of her parole officer, her children and DCYS in early July, less than six months after her release from prison. When next she surfaced, she was again incarcerated, and remained so to the date for disposition. This constitutes clear and convincing proof that she has "failed to achieve such degree of person rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child[ren]. . . [she] could assume a responsible position in the life of the child[ren]". The only clinical witness to testify, Dr. Welsh, who saw mother and children immediately prior to commitment and again a year later, confirmed that the foreseeable future holds no promise for any change in this pattern soon enough to benefit these children. The applicable statute ". . . requires proof by DCYS only that the parents of a neglected or uncared-for child have failed to achieve such degree of personal rehabilitation as would encourage the belief that with a reasonable time, considering the age and needs of the child, they could assume a responsible position in their child's life". In Re: Reyna M ; 13 Conn. App. 23, 32 (1987).
The fact that the father disappeared from the lives of these children, never appeared long enough after the birth of his namesake even to acknowledge paternity, and has had no contact with them or offered any plan for their care for over three years prior to the adjudicatory date, supports, by clear and convincing proof, the same finding as to him.
(3) Abandonment — the evidence is overwhelming that the father of these three children has abandoned them, not only within the definition of the statute, but also within the more stringent requirements of the common law. He has not seen them; his whereabouts for over three years have been unknown to the children's caretakers and legal guardian.
Rosa G. unquestionably abandoned these children for six months in 1991. Prior to April of 1991 she was incarcerated and sought and obtained monthly visits in Niantic. Immediately upon her release she requested a visit and while she failed to appear for the first, she saw the children six times in the next two months. (State's Exhibit C., p. 14). After April 19, 1991, however, she did not visit or request a visit; she returned to drug use and dropped out of all drug treatment programs. Her whereabouts were unknown until she was again CT Page 2096 arrested on August 30, 1991, a fact of which DCYS was not made aware until mid-September of 1991. She then requested that visits at Niantic be resumed, but they did not upon the recommendation of the psychologist who had seen mother and children in 1990 and again during the pendency of this action. Between April and September, therefore, Rosa G. unquestionably abandoned these children, but before April and after September she attempted to maintain her connection with them as much as possible for an incarcerated person. This falls short of clear and convincing proof of abandonment for 12 months, and the state has not argued why as much as seven of the required 12 months should be waived. This grounds is, therefore, dismissed as to the mother.
(4) No on-going parent-child relationship. It does not take a clinical evaluation for a trier of fact to conclude that as to a parent who has been out of his children's lives for more than three years, there can be with children now ages seven, five, and three, no parent-child relationship and to permit further time for one to be reestablished — or in the case of the youngest, established — would be an exercise in futility and therefore inconsistent with the children's best interests.
As to Rosa G., it is clear that there is no parent-child relationship as that term is defined in the statute as ". . . the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child." Caselaw, however, requires that such relationship cannot be found to be nonexistent so long as children have positive memories of, or feelings for, the noncustodial parent.
Dr. Welsh was unequivocal, following the interaction study of October 22, 1991, that the youngest child "doesn't totally recognize who she is." (State's Exhibit J. p. 4) Considering that he was placed when less than two years old and has seen his mother nine times in the year following placement, this conclusion is fairly supported by the evidence. The girls, however, after having not seen their mother for six months, recognized her and evidenced affection for her. (Id., p. 2) Under the additional requirements for this ground to be found imposed in In Re Jessica M., 217 Conn. 459, 470 (1991), however, it cannot be found by clear and convincing evidence that the children have no memories or feelings, or exclusively negative memories or feelings, for their mother. This ground, therefore, is dismissed as to Rosa G. with regard to her two daughters.
Disposition — On facts as of January 29, 1992, last day of trial. CT Page 2097
In the nearly three months between the adjudicatory date (November 6, 1991) and the dispositional date (January 29, 1992), the father has continued to be absent from the lives of these children and from these proceedings. The mother, however, has been released from prison (December 10, 1991), completed a thirty-day "locked-in" inpatient drug program to which she was stipulated directly from prison, and five days after her release to the community was again arrested and incarcerated. No further visits have taken place with the mother in prison, a decision made by DCYS on the recommendation of Dr. Welsh.
Before a court may terminate the rights of any parent, it must make findings on the six considerations set forth in subsection (d) of 17a-112:
(1) The first service necessary to initiate efforts to reunify Rosa G. with these three children must be to address her drug problem. According to the psychologist, only if this were brought under control could her antisocial personality disorder be dealt with in a way that would permit her to assume child care responsibilities.
Between DCYS and the mother's parole officer, a number of drug programs were recommended and initiated — but never completed — by the mother. These included the Regional Network, CASA, A.I.C. In addition, she completed time-limited detox programs twice (Danbury Hospital in the spring of 1991 and a 30-day "locked in" program in December of 1991). Soon after her release, from each Rosa G. returned to substance abuse. No services can be offered to an absent parent, such as the father herein.
(2) No court orders were entered into in this case, but three service agreements were worked out between the mother and the DCYS social worker (State's Exhibit D, E, and F). After signing the third, Rosa G. disappeared for two months, and when her whereabouts became known, she was again in prison. No orders or agreements can be entered into with the parent, such as the father in this case, whose whereabouts are unknown.
(3) Emanuel displays no feelings or emotional ties with his mother, but is well-adjusted to the foster mother who has had his care since he was less than two and who is committed to caring for him permanently if he is free to be adopted. Rita E. and Rosa E. show signs of knowing who their biological mother is and wanting to please her, but their interaction was more volatile in 1991 than in 1990, the mother appeared less able to control their behavior, and the clinical psychologist CT Page 2098 characterized their relationship as "conflicted". (Testimony of Dr. Welsh, January 22, 1992.)
(4) These children, now seven and one-half, five and one-half and three, have spent the last 16 months in foster care. The five months preceding their placement were marked by repeated episodes of neglect and, in the case of the girls, abuse. By the end of January, 1992, their mother was no nearer to being able to care for them than she was when they were first placed. They need to be assured permanency in homes that are safe and nurturing before they enter the shoals of latency and adolescence. They are now all together in a foster home that has had Emanuel since he was less than two and that is willing to keep all three siblings together indefinitely. A permanent safe home should not be withheld from them any longer.
(5) The father of these children has made no effort whatever to become able to care for these children and has had no contact of any kind with them or their caretakers for more than three years. Their mother has made sporadic efforts to visit them and to seek drug treatment, but has been able to sustain neither. During the first half of 1991 she made brief efforts to secure drug treatment and visit the children as often as permitted. She has not seen them since April of 1991, was out of contact altogether with the children and their caretakers from July until September, and five days after her most recent release from prison (January 10, 1992) was rearrested and back in prison. It is clearly not in the best interest of any of these children to be returned to their mother in the foreseeable future.
(6) The only impediment to Rosa G. maintaining a meaningful relationship with these children was the refusal of DCYS to reinstitute prison visits after these petitions were filed. This decision cannot be deemed unreasonable, however, in view of the pendency of this proceeding and the unequivocal recommendation of the clinical psychologist.
Having considered the foregoing it is found by clear and convincing evidence to be in the best interests of each of these children for their parents' rights to be terminated so that they may know the permanency of adoption. It is therefore ORDERED that the parental rights of Rosa G., and Manuel E. in and to the children Rita E., Rosa E. and Emanuel G. be, and they hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing these children forthwith in adoption, and to secure that end is ORDERED to submit to this court no later than 90 days after the date of this judgment a written report as to the progress of such adoption. CT Page 2099 If adoption is not then finalized, the said Commissioner is further ORDERED to submit to this court a Motion to Review Plan for Terminated Child no later than June 15, 1993 to ensure a judicial review on the record within 18 months of this judgment to be in conformity with federal law.
Appeal
Rosa G. has 20 days from the date of this judgment in which to take an appeal. If she requests an appeal and her trial counsel is willing to represent her, this court will appoint that attorney to act as appellate counsel at public expense until all appellate process is completed. Practice Book #4017. If however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, she is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book #4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party will then be informed by the court clerk that she has the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1965).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the children whose interests are entitled to at least as great a degree of consideration as those of the parent whose right to raise the children are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process, which could take years, is exhausted.
Entered at Bridgeport this 6th day of March 1992.
FREDERICA S. BRENNEMAN, JUDGE